

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

March 11, 1949

Hon. H. A. Hull, Chairman
Committee of the Whole
House of Representatives
51st Legislature
Austin, Texas

Opinion No. V-784

Re: Constitutionality of S. B. 19,
51st Legislature, supplement-
ing State Aid appropriation
for teachers' salaries.

Dear Sir:

Your request for an opinion of the Attorney General in-
quires as to the constitutionality of Senate Bill 19, 51st Legislature,
now pending in the House Committee of the Whole, and whether any of
the money appropriated thereunder may be used in the payment of in-
terest on money borrowed by any individual or subdivision of the gov-
ernment to meet the obligations proposed to be covered by this supple-
mental appropriation bill.

Sections 1, 2, and 3 of the proposed bill are:

"Section 1.   There is hereby . . . appropriated
the sum of Three Million ($3,000,000.00) Dollars as
a supplemental appropriation to the funds appropriated
for salary aid in House Bill No. 295 of the Acts of the
Regular Session of the 50th Legislature.

"Sec. 2.   The funds herein appropriated are to
be used to supplement payments for salary aid for the
first year of the current biennium 1947-1948 and for
any other legal purpose.  It is specifically provided
that the expenditure of this supplemental appropriation
shall be made under the same terms and conditions and
in the same manner as the payment of the regular ap-
propriation for salary aid provided in House Bill No.
295, aforementioned, were made, and is to be propor-
tioned by the schools which are eligible to receive such
aid under the provisions of House Bill No. 295, which
schools have been approved for certain amounts, here-

tofore, so that each school is to receive the same proportionate share of this supplemental appropriation, and the amounts prorated to each school out of this supplemental appropriation together with the amounts heretofore appropriated for salary aid in House Bill No. 295 is hereby designated to be in full and complete payment of any claim made by any school for salary aid under House Bill No. 295 for the first year of the current biennium 1947-1948.

"Sec. 3.   All applications for salary aid in order to be eligible to participate in the provisions of this Act, shall be eligible for aid under the provisions of House Bill No. 295 of the Acts of the Regular Session of the 50th Legislature."

The 50th Legislature in Article XIII of H. B. 295, the State aid school law for the biennium 1947-49, made the following appropriation:

"Section 1.  Appropriation.  For the purpose of promoting the equalization of educational opportunities afforded by the State of Texas to all enumerated scholastics within the State as hereinabove set out, there is hereby appropriated out of the General Revenue Fund of the State of Texas, not otherwise appropriated, the sum of Eighteen Million Dollars ($18,000,000) for the fiscal year ending August 31, 1948, and Eighteen Million Dollars ($18,000,000) for the fiscal year ending August 31, 1949, or so much thereof as may be necessary for the biennium ending August 31, 1949, to be allocated and expended under the provisions of this Act by the State Department of Education and under the supervision of the Legislative Accountant.

"Sec. 2.  Allocation.  It is hereby specifically provided that out of the money appropriated for each school year of the biennium, the sum of Ten Million, Seven Hundred and Seventy Thousand Dollars ($10,770,000) is hereby set aside for salary aid; . . ."

It has developed that the 50th Legislature underestimated the total valid claims of eligible school districts for teacher

salary aid under H. B. 295, presumably to the extent of $3,000,000.00 for the 1947-48 year of the biennium and to the extent of $6,000,000.00 for the 1948-49 year of the biennium, according to the estimates fixed in proposed S. B. 19.

Our study of the law relating to this proposed legislation has required a thorough investigation of the background, facts, and purposes of the appropriation. This is true especially with reference to the proposed $3,000,000.00 to pay in full the total salary aid applied for by eligible districts acting under H. B. 295 for the 1947-48 fiscal year, the first year of the present biennium.

We find that the 50th Legislature in Article III of H. B. 295 fixed the salary schedule and length of term teachers therein shall serve and be paid. Eighteen million dollars "or so much thereof as may be necessary" was appropriated for each year of the biennium. When teacher contracts were entered prior to September 1, 1947, there was no apparent reason to doubt the sufficiency of the appropriation. The Act provided that, "Districts receiving aid under the provisions of this Act shall issue warrants for not to exceed the amount approved in the budget . . ." The budgets of the various school districts, which were prepared in August 1947, were approved by the State agency. On the basis of such approved budgets, various contracts with teachers were entered into.

However, as early as October 15, 1947, it was evident and so announced to County Superintendents and Superintendents of Equalization Schools by letter from the Director of Equalization, State Department of Education that "salary aid will be approximately 16% short this year." That letter said further:

"There will be no cut of items in the budget, but the reduction will come in the total salary grant on a percentage basis. Teachers' salaries must continue to be paid on the schedule. If the school does not have enough money in the allowance per teacher and/or local tax above the 50¢ rate to pay the total salaries for the full term, it will be necessary to cut the term short to avoid a deficit in the funds of the local school. It is not advisable to run into a deficit."

By March 26, 1948, it was evident and so announced by the Director of Equalization that final salary aid payments for 1947-48

would be 20% short instead of 16%. In the meantime a special session was requested by the Texas State Teachers Association and certain school and State officials to make up the deficit. Thereafter, the Governor worked out a plan by which the banks of Texas would advance necessary funds to the teachers or the districts to keep the schools open for the full term, and avoid a special session of the Legislature.

On April 1, 1948, the Joint Legislative Committee, after conference with the Governor and State Superintendent of Public Instruction, adopted a resolution requesting the State Superintendent to make payment of 50% of State-aid grants to the school districts "at the earliest time possible, the first week in September, for the next fiscal year beginning September 1, 1948." The purpose of this advance payment for the 1948-49 fiscal year was stated in a letter of August 2, 1948, from the Director of Equalization to County Superintendents as follows:

"The advance payment is being made early in 1948-49 in order to make up for the deficit on 1947-48 until the Legislature meets and makes additional funds available."

It appears that various school districts and banks used various methods to provide funds for teachers' salaries during the deficit period. A few districts are reported to have made no additional payments, merely promising to do so if and when the money is made available by the Legislature. Other districts issued deficiency warrants under Section 2 of Article IX of H. B. 295. In some cases the banks made personal loans to the teachers to be settled if and when their additional warrants are paid. However, most districts are said to have borrowed the necessary funds direct from the banks and already repaid them out of the advance of rural aid funds for 1948-49. In the latter instances, there is now no debt to the banks for 1947-48 salary advances, the same already having been paid from 1948-49 funds.

For the sake of the record, it should be noted that the Attorney General was not consulted as to the validity and constitutionality of these transactions on any phase of this question. The plans were negotiated and followed without our knowledge or advice.

We are called upon now for the first time to pass upon the legality of this borrowing by the school districts because of your

question as to whether the Legislature can authorize payment of interest on money borrowed by any individual or district to meet any portion of the $3,000,000.00 deficiency. This we answer in the negative.

School Districts are not authorized to borrow money in excess of their anticipated current year revenues. Clearly H. B. 295, Acts 1947, contains no provision authorizing eligible districts to borrow money and pledge anticipated revenues therefrom in payment of loans.

Article 2827, V. C. S., authorizes a school district to borrow money on a short term loan to pay salaries and interest thereon, but it has definite limitations which control our present question. It reads in part as follows:

"The public free school funds shall not be expended except for the following purposes:

"1. The State and county available funds shall be used exclusively for the payment of teachers' and superintendents' salaries, fees for taking the scholastic census, and interest on money borrowed on short time to pay salaries of teachers and superintendents, when these salaries become due before the school funds for the current year become available; provided that no loans for the purpose of payment of teachers shall be paid out of funds other than those for the then current year."

Assuming that State-aid funds are included in the above authorized use, they are specifically limited to "those for the then current year". No district could have anticipated full State-aid salary payments for 1947-48 after being notified of at least a 16% shortage by the Director of Equalization on October 15, 1947, as heretofore set out. At such time when those sources of school revenue which could be reasonably anticipated by the district proved to be insufficient to meet the expenses of that current school year, the district trustees were without authority to borrow money and pay interest thereon for the payment of its teachers' salaries.

This has been the consistent holding of our Supreme Court under statutes other than H. B. 295. Thus in Collier v. Peacock,

93 Tex. 255, 54 S.W. 1025 (1900), the Court held:

"... the trustees were not authorized to
contract any debt which would cause a deficiency
in the school fund of the district; in other words,
they could not contract debts in employment of
teachers to an amount greater than the school
fund apportioned to that district for that scholas-
tic year. This limitation upon the power of the
trustees in making the contract with the teachers
necessarily limits the payment of the debts . . .
and any debt contracted greater ... would be a
violation of the law, and constitute no claim
against the district. . . . The trustees were au-
thorized to expend the sum set apart to the dis-
trict, but not empowered to contract a debt
against the funds of future years . . . ."

And in Warren v. Sanger I.S.D., 116 Tex. 183, 288 S.W.
159 (1926), the Court wrote:

"The act of defendant trustees, however
commendable the spirit in which it was done,
creating the debt here sought to be paid, was
void. It was contrary to the express provisions
of law ... art. 2749 forbidding trustees to create
a deficiency debt against the district in the em-
ployment of teachers. The debt as against the
district being void, there was nothing for the
school authorities to pass on . . . They could, in
no event, have decided in favor of the application
of the 1925 taxes to the payment of the deficiency
created in a previous year."

The most recent case in point is that of City State Bank
of Wellington v. Wellington I.S.D., 142 Tex. 344, 178 S.W.2d 114 (1944)
where Justice Brewster said for the Court:

"... to permit the bank to recover from
the district's delinquent maintenance taxes on
checks issued against its available school fund,
... would be to circumvent the express provi-
sions of Art. 2749 . . . as well as the plainly im-
plied prohibitions of Art. 2827, . . . unequivocally

provides that 'trustees, in making contracts with teachers, shall not create a deficiency debt against the district.' . . . That is, no valid debt can be created against the available fund to pay teachers unless the claim can be paid out of available funds coming in for that year."

Our Constitution provides that, "The Legislature shall have no power . . . to . . . pay, nor authorize the payment of, any claim created against any county or municipality of the State, under any agreement or contract, made without authority of law." Art. III, Sec. 53. A school district is a "municipality" within the meaning of that Section. Harlingen I.S.D. v. C. H. Page & Bro., 48 S.W.2d 983 (Comm. App. 1932).

Therefore, the Legislature is without authority to appropriate money to pay interest on such unauthorized debts or to pay the debts themselves.

Also, whatever may be said hereinafter about preexisting law supporting a present appropriation for payment of 1947-48 teacher salaries, the same would not apply to an appropriation to pay interest on funds borrowed for such purpose by the district or any individual.

Section 44 of Article III, Constitution of Texas, provides in part:

"The Legislature shall not . . . grant, by appropriation or otherwise, any money out of the Treasury of the State to any individual, on a claim, real or pretended, when the same shall not have been provided for by preexisting law; . . ."

Neither H. B. 295, Acts 1947, nor any other preexisting law, authorizes borrowing of money and payment of interest thereon by a school district or the State under the circumstances now before us. Therefore, in the absence of the required preexisting law, an appropriation to pay interest or the use of any part of the money appropriated by S. B. 19 for payment of interest would be unconstitutional.

S. B. 19 does not specifically mention interest, but you have asked the question under the impression that payment of interest was contemplated by the following underscored portion of the phrase in Section 2, "to be used to supplement payments for salary aid . . . and for any other legal purpose." These underlined words replace the words "and for no other purpose" in other similar bills. It is our opinion that the phrase "and for any other legal purpose" will not itself support the expenditure of any money for any purpose, because it is too broad, general, and uncertain. Section 6 of Article VIII of the Texas Constitution provides, "No money shall be drawn

from the Treasury but in pursuance of specific appropriations made by law." The phrase above quoted cannot qualify as a specific appropriation. National Biscuit Co. v. State, 134 Tex. 293, 135 S.W.2d 687 (1940); Dallas County v. McCombs, 135 Tex. 272, 140 S.W.2d 1109 (1940). It should be rewritten so as to state clearly and specifically what it is intended to cover. If it is intended to cover an illegal expenditure such as interest, the phrase should be eliminated.

While the Legislature cannot constitutionally appropriate money to pay interest on unauthorized debts of school districts, our next and most vital question presents an entirely different problem. The cases heretofore cited dealt with powers of the districts under the general statutes. The districts clearly had no power, under the above cases, to borrow any money for the purposes here under consideration. But now we are considering the Legislature itself and its power to correct and amend in the same biennium its own estimate of the amount of money it feels necessary to carry out a program it prescribed itself and proposed to carry out through the various districts. The question now is whether the Legislature may supplement the appropriation of the first fiscal year of the present biennium for the purpose of paying direct to school districts the amount of salary aid they qualified for and owe to their teachers under H. B. 295 for the 1947-48 school year.

Here we have no question of preexisting law. H. B. 295 provides that the teachers shall be paid a salary within certain specified limits. It provides the length of the school term. And it authorizes the issuance of warrants to cover such contracts. It provides in Section 2 of Article IX that:

"Districts receiving aid . . . shall issue warrants for not to exceed the amount approved in the budget . . ."

Further, the Texas Constitution, Section 1, Article VII, reads:

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

And in Section 3 of the same Article, we read:

> ". . . provided, however, that should the
> limit of taxation herein named be insufficient the
> deficit may be met by appropriation from general
> funds of the State . . ."

The use of general funds for aid to rural schools and the broad authority of the Legislature in such matters was settled by the Texas Supreme Court in Mumme v. Marrs, 120 Tex. 383, 40 S.W. 2d 31, wherein the Court said:

> "Since the Legislature has the mandatory
> duty to make suitable provision for the support
> and maintenance of an efficient system of public
> free schools, and has the power to pass any law
> relative thereto, not prohibited by the Constitu-
> tion, it necessarily follows that it has a choice in
> the selection of methods by which the object of
> the organic law may be effectuated. The Legis-
> lature alone is to judge what means are necessary
> and appropriate for a purpose which the Constitu-
> tion makes legitimate. The Legislative determi-
> nation of the methods, restrictions, and regula-
> tions is final, except when so arbitrary as to be
> violative of the Constitutional rights of the citizen."

Under this Constitutional authority, the Texas Legislature has many times supplemented rural aid funds for previous years of the same biennium. In those instances, as in the present case, the previous Legislature underestimated the needs for the biennium. The previous Legislatures, having appropriated a lesser sum than was needed, left no duty or legal obligation on the subsequent Legislatures to make a supplement. But each subsequent Legislature has evidently assumed that the Constitution and former appropriation bill was sufficient preexisting law to warrant the use of its discretion in making the supplemental appropriation. Some of the past instances are as follows:

1. In 1929 the 41st Legislature (H. B. 126, Acts 1929, 2nd C. S., P. 19) supplemented the Rural Aid Bill of 1927 (S. B. 7, Acts 1927, 1st C. S., P. 105) in the sum of $450,000.00.

2. In 1933 the 43rd Legislature (S. B. 242, Acts 1933, p. 530) enacted a supplemental appropriation of $1,620,000.00 to the 1931 Rural Aid Law (Chapter 272, Acts 1931). It authorized the use of this money in tabulated amounts for the prior biennium years of 1931-32 and 1932-33.

3. In 1937 the 45th Legislature (H. B. 600, p. 585) supplemented the Rural Aid Bill of 1935 for the first year of that biennium. The Attorney General of Texas, at least by implication, approved the constitutionality of that bill. (Letters of Attorney General, Vol. 377, p. 761-762.)

4. In 1939 the 46th Legislature (H. B. 978, Vol. II, Acts 1939, p. 493) supplemented the salary aid appropriation of 1937 by $718,255.00. Section 3 thereof gives the purpose: to supplement payments for salary aid for the "first year of the biennium 1937-38 and for no other purpose."

These above designated supplementary rural aid appropriation acts, in so far as we know, were unchallenged in the courts. Thus, as has been shown, the Legislature in 1929, 1933, 1937 and 1939, has consistently construed the Texas Constitution as permitting the enactment of rural aid supplementary appropriations for both the first and second years of a current biennium. The executive department has approved and executed these laws.

As stated by the Texas Supreme Court in Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31 at page 35:

". . . The universal rule of construction is that legislative and executive interpretations of the organic laws, acquiesced in and long continued, as in the case before us, are of great weight in determining the validity of any Act, and in case of ambiguity or doubt will be followed by the Courts." (Emphasis added by Supreme Court.)

A recent opinion by the Attorney General, V-376, holds that it is within the Constitutional power and discretion of the Legislature to supplement a current biennial appropriation. The

facts there were that the appropriation for the Texas Prison System was insufficient to feed and clothe the prisoners. Of course, a different rule would apply after the end of the biennium.

It is our opinion, therefore, that the 51st Legislature during the present biennium has authority to make an appropriation supplementing a prior appropriation made by the 50th Legislature in H. B. 295 for salary aid purposes, since the prior Legislature underestimated the amount needed to pay in full the salary aid claims legally made by eligible school districts acting under the provision of H. B. 295, in the 1947-1948 and the 1948-1949 school years.

This opinion contemplates that the money appropriated by S. B. 19, now under your consideration, for 1947-48 will be used by the school districts to pay their unpaid teachers for the 1947-48 year by issuance of warrants to them or payment of outstanding warrants. As previously stated, since the districts were not authorized to borrow the money, no part of the contemplated appropriation should be used to repay district debts. Likewise it contemplates that the sum appropriated for the present 1948-49 fiscal year will be used only for State-aid authorized and applied for during this fiscal year.

If any other lawful use of the money is contemplated, the bill should be redrafted accordingly. For instance, we think it our duty to observe that most school districts followed the suggestions of the State officials heretofore mentioned and paid their teachers or the banks the 1947-48 shortage out of this year's (1948-49) appropriation. Such action was unauthorized by law. But to the extent the 1947-48 deficit has been paid out of 1948-49 funds, the final shortage will be in the present fiscal year rather than last year.

In other words, if the entire $3,000,000.00 of the 1947-48 deficiency has already been paid out of the appropriation for the present fiscal year, there is now no indebtedness to teachers for 1947-48 which would support the $3,000,000.00 appropriation for that year. The $3,000,000.00 shortage would be added to the shortage in the appropriation for the present fiscal year.

If the Legislature in its wisdom and discretion wishes to appropriate the total amount needed to settle with districts on the basis of H. B. 295 for the whole 1947-49 biennium, S. B. 19 should be rewritten to make the unneeded balance for the 1947-48 fiscal year available for the present fiscal year ending August 31, 1949, in view of the present state of affairs.

The bill also contains an amendment to Section 2 of Article III of H. B. 295, 50th Legislature, changing the present law as to base pay for vocational teachers by adding the following words: "provided the proposed plan for such twelve (12) months' programs have been approved individually and in advance by the State Board for Vocational Education," etc. This and other changes in teacher salary schedules and qualifications for eligibility are constitutional, but cannot be given a retroactive effect in such a manner as to destroy any presently existing contractual rights of the teachers concerned. Section 16 of Article I, Constitution of Texas; Federal Crude Oil Co. v. Yount-Lee Oil Co., 122 Tex. 21, 52 S.W.2d 56 (1932); A. G. Opinion V-674.

## SUMMARY

1. School districts cannot legally borrow money and contract for interest for payment of salaries in excess of their anticipated current year's revenue. Art. 2827, V. C. S. Such loans being unauthorized, no part of the proposed appropriation may be used to repay them nor to pay interest thereon.

2. The school districts under H. B. 295 were authorized to enter into the contracts with their teachers on the basis of the State approved budgets. While the contracts may not be enforceable by the teacher where the money to pay them has run out, they nevertheless are valid obligations where there is sufficient money on hand or where the money is made available in a lawful manner. Although the Legislature is not legally bound to supplement its salary aid appropriation for 1947-49 to pay the obligation of districts which owe their teachers under such contracts, there exists sufficient constitutional and statutory authority for the Legislature in its discretion to make such funds available to the districts for such purposes. None of such funds should be used for payment of unauthorized school district loans or interest. Such supplemental appropriation is constitutional only if made before the end of the current biennium.

3. Most of the salary aid shortage for 1947-48 has been met already from the advance payment of 50% of the 1948-49 appropriation. While this procedure is unauthorized by law and was followed without the knowledge or advice of the Attorney General, most of the 1947-48 deficiency has been extinguished and the 1948-49 shortage has been enlarged by the same amount. Therefore, under the present state of affairs, any appropriation desired to be made by the Legislature should be redrafted to correctly designate the amount needed for each year or make the entire amount available for the biennium rather than for separate years.

Respectfully yours,

Price Daniel
Attorney General

Chester E. Ollison
Chester E. Ollison
Assistant

The foregoing opinion was considered and approved in a conference composed of the Attorney General and Assistants Joe Greenhill, Charles D. Mathews, W. V. Geppert, and C. K. Richards.